System and would ask that when the yellow light comes on, you have two more minutes in your presentation, and when the red light comes on, we ask you to conclude unless you're answering a question from the court. We have read the briefs and record excerpts. We have not necessarily gotten into the whole record before this hearing, so we appreciate your record citations when you're arguing. And with that, we will call the first case of the afternoon, number 18-20395, United States, XREL Patel v. Catholic Health Initiatives. We'll hear from Mr. Patel. Are you related to the doctor? No. OK. May it please the court. My name is Hiran Patel, and I represent the appellate's relators, Dr. Satish Patel and Dr. Hemalatha Vajayan. In this appeal, the relators asked this court to conduct a de novo review and reverse the district court's dismissal of their complaint under Rule 12b-6. The complaint alleges claims under the Federal False Claims Act arising from two fraudulent schemes centered on the St. Luke's Sugarland Hospital in Sugarland, Texas. These schemes are what I wish to address in turn. The first one involves a series of transactions in 2011, which I'll refer to as the rescission transactions, in which the St. Luke's entities forced the St. Luke's Sugarland Partnership, then undisputedly the owner of this hospital, to make offers of rescission to the physician partners or co-owners under the Texas Securities Act. The second fraudulent scheme deals with the aftermath of the first one, because St. Luke's did not succeed in their first scheme to eliminate all their physician partners, and thus they started to then misrepresent the ownership structure of the hospital so that they could expand the hospital's facilities, which they otherwise would not have done. Let me ask you on that. The government is clearly now aware of the facts of this case. Have they stopped paying the hospital for reimbursements? No, they haven't, but that's a concern certainly I can understand. There's no knowledge that I have as to why the U.S. Attorney may or may not have informed CMS to change its practices, but one can certainly see, the U.S. government being of the real party interest here, that the U.S. Attorney may not want to cause CMS to change its practices in a way that would benefit the merits of this case on behalf of the relatives. That would be like litigants affirmatively trying to affect the outcome of the case. That may be one of the reasons why the U.S. Yeah, but if you wouldn't pay something, if you knew fact X, you would stop paying, then it would seem that once you learned fact X, you would stop paying, and failing to do that would suggest that that doesn't bother you, because we certainly have had other cases where they have become aware of a fact, and that has caused a problem. So if they don't have to pay because of this alleged misrepresentation of ownership, why are they paying? Your Honor, I don't know exactly what CMS's decision making here is, but this is at the pleading stage of this case. Certainly reasonable to presume that CMS may not change its position at this point, waiting for the outcome of this case, but what is clear, and the complaint makes absolutely clear, is when St. Luke's first tried to convince CMS that the ownership structure of this hospital had changed, CMS did stop paying. That is a fact that's alleged with particularity in the complaint. That decision by CMS to stop paying was because CMS did not buy what St. Luke's was selling them when it came to some transfer of this hospital to the entity that St. Luke's claimed had essentially inherited the hospital at that point. So it took six months when CMS was trying to sort through the misrepresentations that St. Luke's was providing them, at which point they didn't pay a dime for any of the covered services provided by the hospital. That's actual history that this is a material decision for CMS, a material factor in CMS's decision to pay. If they're not convinced that the ownership structure is correct, they're not convinced that who they are going to pay is the correct entity that should be paid, CMS does not pay. And that's why CMS also requires any time there's even a small change in ownership structure for that ownership structure change to be reported and for CMS to review the supplementary documentation and ultimately prove that the ownership has changed and that payments can resume. Is there anywhere in the complaint, the allegation or the statement that the government would have stopped paying if it had known about the ownership? Not exactly in those terms, but there is in the complaint, specifically on page 51 of the record, where there is a discussion about evidence introduced at a hearing in the state court proceeding where one of the named defendants admits, testifies specifically, that when CMS did not agree with the change of ownership analysis that St. Luke's was telling them, that CMS did not actually pay. But at the 12B6 stage, though, isn't that kind of a critical allegation that's missing from the complaint? Well, Your Honor, yes, in those specific terms, perhaps, my argument is that the specifically pled facts in the complaint support that influence, and it is certainly something in an amendment we can put those particular words that CMS stopped paying because they did not agree with the change in ownership structure information that St. Luke's was providing them. That's certainly an allegation we can supplement in an amendment. We haven't had a chance to amend to address any of these concerns, but the actual facts alleged support the inference that CMS did consider this to be material because they actually did stop paying, and that is in the complaint. I hope I answered your question. You're asking for damages under the False Claims Act, are you not? Damages in civil penalties. You know, if CMS did what you said it should do and stopped paying, how could they possibly pay off the damages you're asking for? You mean the hospital, how it would have the financial resources? Excuse me, yes, I could, right. Well, certainly, if CMS had stopped paying and had not resumed payments, then the prospective liability for this under this claim would be curtailed at that point because there wouldn't be ongoing claims that St. Luke's would be submitting. If St. Luke's wouldn't have been permitted to expand and it was losing money at the time that this decision occurred, they'd be broke. I'm just asking how practical this is. Certainly, Your Honor, that's a good concern. I don't believe that there's any factual basis to suggest that St. Luke's could not have paid for the ongoing operations of the hospital had the hospital not been allowed to expand its facilities. That was something St. Luke's wanted to do, absolutely, but there's nothing to suggest that St. Luke's could not have operated the hospital without such expansions. Your argument in the TSA issue depends in part on rulings of the state courts, does it not? Or you claim that the state courts vindicated that your clients had never really sold out their interests. Yes, Your Honor, except that's not about the TSA issue, but that is about the second fraudulent scheme, about the transfer of the hospital. It does depend on state court rulings, but in a secondary sense. Initially, the complaint makes it clear that St. Luke's knew that their theory that the last remaining partner of the general partnership automatically inherits the assets of the partnership. St. Luke's knew that that was absolutely wrong and there was no basis for that under Texas law. Now, a year later, St. Luke's was able to present that issue for the first time in court and we're not going to begrudge anyone from trying to ask for a change in the law. It would have been a monumental change in Texas partnership law. I mean, imagine law firm partnerships, those are pretty common. Yeah, but my understanding is that there's never, at least as I read the procedural record, there has never been a definitive decision by the Texas courts that after the capital call, after your clients refused to pay up on the capital call, they still owned an interest in the hospital, and there has not been a definitive decision that I believe because the court said that you did not seek to reverse the effects of the rescission. Not exactly, Your Honor. On the issue of ownership, there was a definitive decision in the Patel case that cited in the briefing. This was the first court of appeal. But that was an injunction, right? Yes. And they vacated the denial of relief and remanded it for trial. Yes, but on the issue of ownership, because of the fact that that was raised in the frame of a mootness discussion, mootness is an issue of subject matter jurisdiction. So even though it was an appeal from the denial of a temporary injunction, on that mootness issue, the first court of appeals had to resolve that on the merits under Texas law, and they did. They resolved on the merits that the hospital ownership had not actually transferred and that the last four physician partners still maintained their ownership interest. So that was definitively decided. It did have a subsequent review to the Texas Supreme Court, but that petition for review was denied. And then they issued the capital call, right? No, you're right. Who's that? Go ahead. The capital call was well before the Patel decision. There were two appellate decisions that cited in the briefing. The first one, the Sonewalker case, that was after the capital call was issued, and that case did essentially hold that the temporary injunction should have been granted, and that was it. It was after remand from Sonewalker that St. Luke's, this is in December 2012, that St. Luke's first claimed that the temporary injunction was now moot because the hospital ownership had already transferred. And their theory was this automatic transfer if you're the last partner and you get everything the partnership has. That was the first time they raised that argument, and it was on the basis of mootness to argue that the injunction would have been moot. And that's what the Patel decision subsequently decided and resolved on the merits because as subject matter jurisdiction is raised, it should be resolved on the merits by the appellate court, even in that type of procedural background where it's a review of a denial of a temporary injunction. So that decision was with finality on the merits. And what is the current status of all of the other proceedings, the bankruptcy and the state court and all of that? What's the current status? A few months ago, all the other proceedings were settled. Okay. That's what I thought. So we're just down to this? Yes, Your Honor. Okay. So the settlement, does that... Moot out. Does that encompass or take away from the finality of any of the rulings in the state court? Because typically a settlement will say we don't exceed liability and blah, blah, blah, and it just kind of wipes everything out and everybody just goes home and smiles. So is that the effect of it, or is there still something lingering on that is binding? There's nothing that is lingering from the settlement, but the settlement didn't reverse or act to unwind any of the prior decisions that were reached in the state court. In fact, and I can't get into specific details, but the settlement actually, if it ever were allowed to be disclosed to the court, it supports our argument with respect to the ownership of the hospital. So there are a lot of specifics that I think that are important. And I think if, given the fact that we've been discussing the second fraudulent scheme, I'd like to return briefly to the first one, just to focus on some of the important, what we believe to be errors in the district court's analysis. They really boil down to whether or not the facts should be tried at this stage. Well, don't you, now you're pleading all this under the constraints of the Fair False Claims Act, which means you have to prove, you have to plead fraud, which means you have to prove the who, what, when, where, and how of the fraudulent activity. And as I understood the district court, what he suggested is that there were valid business reasons supported by at least arguable legal reasons why the hospital proceeded as it did in both the buyout and the capital call and so on. And since there were two alternative plausible scenarios, that you didn't satisfy Rule 9b for pleading fraud. Your Honor, if I may, I believe the district court made it clear that the decision was not based on Rule 9b, but it was based on Rule 12b-6. Well, fine. But you still have to plead fraud. Yes, Your Honor. And the way we had approached it in the complaint and before the district court was that it was based on this court's prior precedent in Grubbs that when you're pleading FCA fraud, you can either do the who, what, when, where, and how of a particular false claim that was submitted, or you can allege with particularity a fraudulent scheme that creates an indicia of likelihood that a false claim was submitted. And so we went with the scheme approach. Now, to address the dual motives that the district court mentioned, there were two motives. There was a motive to eliminate the physician partners and a motive to overpay the physicians substantially more than the fair value of their partnership units in order to induce further referrals from especially a number of high volume referral sources that had been identified. But what evidence is there of that? That they had the intent to do so? Yeah, because basically you were faulting them for trying to do right by the doctors that had bought in originally. Now we'd rather not have the doctors. We want to do right by them. We want to avoid lawsuits like the one your client filed saying y'all haven't been running this well and you've been losing money. And so they do this rescission and now you say, oh, well, boom, that's evil. That seems inconsistent with just good business, good business of doing right by people that have done right by you. Well, Your Honor, I don't think there's anything to suggest that there was any consideration about doing right by anyone. St. Luke's complaint makes it clear they were looking for ways specifically to overpay the physicians. And it wasn't just to do right by them, but it was as part of a scheme because they wanted to encourage ongoing referrals that was critical to their business. Where is that evidence? Where is that indicated? Because, again, the fact that you were trying to keep good feelings in people about you, in my opinion, isn't enough to show that you're doing the kickbacks and so on. Well, more to the point, I mean, in addition to that point, the difference between $5,000, which was supposedly the market value of these interests after the government screwed them up, and $40,000 plus interest saves even $40,000 per physician, is hardly going to be a big inducement. That doesn't even pay for many physicians' automobiles, to be very blunt about it. It's not that much money as far as a bribe goes. So, I mean, just on its face, that seems an implausible theory. So let me try to address both of your questions by focusing on the allegations about what St. Luke's actually did. So instead of just approaching this based on the partnership agreement, where they had a mechanism built in so that due to a change in the law, they could actually buy out the physician partners as a result of a change in the law using the partnership agreement's appraisal methods, that was available. That was a legally permissible way that the physician partners had even agreed to because they all agreed to the partnership agreement. But instead of exploring that option, St. Luke's explored things that were clearly fraudulent. One of the things that they considered, which is discussed specifically in pages 24 and 25 of the record, is they considered filing a sham lawsuit, basically a fake lawsuit, that they could then settle and resolve by overpaying the physicians as part of the settlement. They were advised by their outside counsel that you couldn't do that because in order to settle litigation risks— You know what? A lot of clients ask their attorneys, can't I do such and such? And the attorney says, no, that would violate the law. And the client says, oh, okay, well, let's find another way. Sure, Your Honor, but— And that just proves they didn't know the law. Your Honor, it proves that they were not looking at the options that they had available that were legally permissible. The second aspect of this is they settled on the TSA, the Texas Securities Act. Their outside counsel told them that this would only work if you could actually point to—Your Honor, I'm out of time. Go ahead. If you could actually point to a real risk of liability under the TSA. The outside counsel made this abundantly clear to them. You can't use this option unless you can point to something. So then they turn around and fabricate a report. They tell a consultant, we need you to put this in a report to justify using the TSA. That's fraudulent intent. That clearly shows they're not looking to do the right thing, and they're ignoring their outside counsel's advice in doing so. If there are no further questions? Okay. Thank you. Mr. Brady. Thank you, Your Honor. May it please the Court, John Brady for the appellees. In 2011, after years of poor financial performance, facing operational challenges because of changes in federal law, and concern about the accuracy that was in the private placement memorandum, the governing board of the St. Luke's Sugar Land Partnership, which consisted of physician members and assistant members, made a business decision. They voted to offer the 96 physician investors who owned 49% of the partnership a rescission. They used the Texas Security Act to guide the rescission process. In return, the full investment to each of the doctors, everybody received the same amount, they paid them the statutory interest required under the Texas Security Act, and in exchange, they received a release, covenant not to sue and release, of all potential claims that the physician investors could bring pursuant to not only the Texas Security Act, but any common law claims, equitable relief, anything they could bring. 92 of the 96 physician investors accepted the rescission. Relator Patel, prior to the beginning of the rescission, had actually sued the partnership, a number of the executives in the St. Luke's system, various subsidiaries. He did not accept the rescission. Three other... And that lawsuit was based on things unrelated to this vote on the rescission, right? Correct. And so that would support the notion that at least some doctors could claim, hey, you're not running this hospital well, or you misled us about the likely profits, or whatever. And so, as I was saying before, you want goodwill, you want to do right by people, just buy them out. You know, this investment just didn't work. Let me buy you out. And it seems funny to me to have someone complain about getting more for their investment than they might could have gotten if you'd used the most tricky legal position. I didn't come into the case until just before we tried it, after four years of litigation. But at that time, the 12th Amendment petition of the plaintiffs contained 16 counts. Fraudulent concealment, simple fraud, numerous breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty under Texas common law, conversion, I can't even remember all the complaints that we tried. And they won some of it. They did. Yeah. We did. By that time, the Texas Intermediate Court of Appeals had reversed the trial judge, and I had to tell the jury, this man was reversed twice. He thought he was doing the appropriate thing, but that's why we're here. We tried the case, they got about $900,000, a little bit less than a million dollars, and they got a trial. On these fraud, these original fraud theories, or on the subsequent rescission vote, or whatever? No, it was basically on the value of the breaches of fiduciary duties with the claims that they got money on. Well, that didn't have to do with the rescission. That had to do with management of the hospital. Well, it also had to do with the rescission. Okay. There were alleged breaches of duty by allowing the rescission to go forward. So what is left for them to recover here? I mean, it just, I don't know. It seems funny to me that they continue to sue under every theory under the sun, and then settle part of that. I just, I'm having trouble understanding. As that case was tried and there was no judgment entered for a while, you know, you form the judgment under Texas law, as you know, Your Honor. And before Judge Schaefer at the Harris County District Court could form the judgment, after the case was tried, he wanted to know, okay, let's do an accounting. We told the jury, we're going to shut this partnership down. The ownership was in dispute, but I couldn't shut it down because there was an injunction. When it came back the second time, the injunction was in place and the judge refused to dissolve the injunction after the trial. So the ownership was, we believe we owned enough and we can shut it down. We own 95% of it. We had to wait until we got a judgment. Once a judgment was entered in 2018, we moved and they filed a bankruptcy. We got the bankruptcy settled. We still couldn't shut it down. Eventually we resolved and all that litigation was over. But the ownership of the partnership was always in dispute, and that's very important on the questions you were asking earlier about the second alleged scheme related to the ownership and whether or not, you know, they claim that every claim submitted after 2011 misidentified the correct owner of the hospital and therefore all of the hundreds of millions of dollars of reimbursement were fraudulent. Well, there's no factual falsity here, Your Honor. We believe we owned it the whole time. The ownership dispute was a part of the litigation. Okay, well, what about that second ruling on the mootness? Does that finally resolve the ownership, or does it just say that that was in question? It should have been addressed. Go down and try the case. And what did the jury say about the ownership? Well, actually the case was tried, and just before the case was tried, we did a 248 as to who owned the claims for claiming even though they only owned 12 shares of the 400 shares. That they had the 49%. They had 49%. Okay, well, we filed a 248 motion. Trial judge ruled, no, you're right, you've got 95%. So the trial underneath, Your Honor, was, well, I went in and said, okay, they've got four points. We'll pay them what we paid everybody else before. We offered them $780,000. That was, at the time, their 12 shares plus interest. Well, the jury had given that. We'd breached the partnership agreement according to the Court of Appeals in that we did the capital fall incorrectly. So we told them, under protection of the law, pay them their attorney's fees. And that's what they got, $980,000 in damages and attorney's fees. And that was their award. Now, they wanted a lot more. They wanted exemplary damages. So today who owns this? Today it's owned by the St. Luke's Health System. Okay. Because the settlement came. The settlement has resolved. We no longer had the stay of the bankruptcy. We no longer had the injunction. So we wound up the partnership and shut it down. It doesn't exist anymore. All right. So what is your answer to why CMS stopped paying you all when you stated that the ownership had changed and they weren't satisfied with the verification of that? What's your answer to that? That means it's relevant. I'm not sure that's actually true. Well, they alleged it. They alleged it. So we have to accept it as true. Okay. Well, there is no unpaid bill for the last eight years. Maybe they didn't pay it for the first couple of months, as he's alleged. But they've paid everything since. Since they learned of this. That's right. And in response to some of your questions from before you, they've known about it. This is a highly publicized litigation. They've known about this dispute for a long time. Well, presumably it's public knowledge, the both Patel appeals. Oh, yeah. The court of appeals decision, I'm sure, is not hidden in a folder somewhere. And when this case was filed. Well, in fact, I know it's not because I've seen it. When the case was filed, it was sealed to government immediately. Six weeks later, it's set not to intervene. I think this circuit is acknowledged that that's an indication that it's probably not a very good lawsuit. Yeah, but, I mean, it's not dispositive. But I'm wondering if it's dispositive on this question of the materiality of the information. Because let's say the lawsuit had said that Dr. X, who is performing all the surgeries in this hospital, is actually not a licensed physician. I think as soon as they found out, they'd stop reimbursing Dr. X. They wouldn't say, oh, well, we don't want to affect the litigation. Let's sit around and wait and see what happens. So I do think that their knowledge now and continuing to pay is a pertinent factor. There's no materiality also, Your Honor, because all of the medical services that were provided, all the goods and services that were provided, have been received. The government's gotten the benefit of the bargain. There can't be any factual falsehood. Right. I was trying to deal with this fact that there were these months where they weren't paying. Is that because they wanted to be sure they didn't pay Judge Jones for something that's owed to Judge Smith and just get the wrong person? Or was it because it matters who owns it? I think it was a CMS issue, regulation of their own little regulation, but it wasn't a false – it wasn't related to the claims that were being submitted, Your Honor. The petition is devoid of any allegation that we violated some rule that we made. The claims are submitted on behalf of the hospital, not on behalf of the owner of the hospital. So any dispute over the ownership of the hospital is not even on the claim form. There's no factual falsehood. Well, I suppose their theory would be that the violation of the anti-kickback statute could affect the value of the claims. Okay, but I don't think – I think Judge Ellison was very clear that with respect to the anti-kickback statute, he found that the defendants had a good faith business decision to use the – their good faith business decision to use the decision rendered their claims implausible. And he carefully went through the claims. You know, the plaintiffs – the relators were required to assert and to allege that the rescission payments were a sham, in essence, that the fair market value compensation that they did – it was not fair market value compensation that we were paying to them. But Judge Ellison – I mean, Judge Ellison found exactly the opposite. He held that the complaint actually alleges a lawful and reasoned business decision. There was an exchange of fair market value consideration for a valuable release, and so there was no anti-kickback violation. He highlighted four factors, Your Honor, in his decision that I think are extremely relevant to your decision. One was that they faced – the defendants faced a credible threat of litigation. It was based on the private placement memorandum misrepresentations. Counsel for Relators suggested that those were fraudulent and they paid for that. Well, HCAI is a very reputable healthcare consultant. It does work all across the country. There's no direct allegation in the complaint that HCAI engaged in fraud. And Judge Ellison felt and held that there was certainly – the projections could be unreasonable and that they provided the basis for the defendants to be concerned. And Patel's pre-rescission lawsuit was a clear manifestation of the risk. And three other doctors joined him. Didn't go through with the rescission either. Second point, the payments were not in excess of fair market value because defendants followed the TSA's, Texas Security Act, statutory mechanism, and they obtained releases, a broad release from TSA liability, any potential liability, any common law liability. Number three, the defendants offered each doctor the same amount of money, irrespective of their pre-referral, pre-rescission, or post-rescission referral volumes. There was no difference. And finally, the relators in their petition failed to tie the rescission payments to any referral by any physician investors. The only thing they can say is, well, a third of the doctors still practice at the hospital. That's the only allegation in there. Two-thirds of them aren't even practicing at the hospital anymore. This is not a kickback. There's no proof of a scheme, no allegation of patient payment based on volume or referrals, no allegation of payments above fair market value, no allegation that the defendants gave the doctors something for nothing. All they can say is, and also two-thirds of the doctors aren't even practicing, they haven't pled a single fact suggesting rescission payments were linked to a referral. It's all conjecture and speculation and naked assertions. The kickback claim is meritless, and that's what Judge Ellison found. With respect to Stark, just briefly, again, the district court found that the rescission payments were satisfied with isolated exception of the Stark statute. Only thing the relators brought up in their complaint is they contest whether or not the rescission payments were consistent with fair market value. But again, for the same reason we talked about before, that ignores the credible risk of litigation due to poor performance and misleading projections, and ignores the fact that the defendants received value in return with those releases. And again, I think in response to one of the questions we had, Judge Haynes, should we be second-guessing the sound business judge decision that these executives and members of the board made? They decided that there was a risk of litigation, they'd already been sued, and it's not a Stark violation to want to have good relations with your doctors. Finally, with respect to legal falsity, it's been waived by the relators. In closing, the district court said it best. Relators' complaint tells a story of ordinary and rational business behavior, and it lacks the credible allegations of intentionally unlawful behavior required for it to survive a motion to dismiss. The relators can't re-plead. They'd have to strike half of their complaint. They've pled themselves out of the lawsuit because what they're alleging is implausible, and what's in their complaint shows a sound business judgment. Thank you for your time. Okay, thank you. Mr. Patel, any rebuttal? May it please the court. To address the allegation of the complaint on the issue of the impetus for Dr. Patel filing his lawsuit, this is from page 27 of the record, paragraph 67 of the complaint. Ironically, it was the means employed by the system to force the partnership to proceed with statutory rescission offers, supposedly mitigating a nonexistent risk of lawsuits from the physician partners that ultimately led to relator Satish Patel initiating the state court lawsuit, which was initially filed in large part to ensure that the system was providing the physician partners with full and complete disclosure of what the system's plans really were. The lawsuit that Dr. Patel filed was the result of the rescission offers first being presented to the physician partners. Did it make claims based upon pre-rescission conduct? Yes. Then it shows that those can be made because either those can be made and were made or y'all filed knowingly false claims. Not exactly, Your Honor. It wasn't disclosed to the physician partners that this April report from HCAI, which is a report that St. Luke's manufactured, that report told the doctors, look, there were these misrepresentations in the offering documents. That's the report that Dr. Patel was giving that formed the basis of those claims. Now, when this case went to trial in the state court, those GSA claims weren't an issue because that report we discovered in that process was fabricated. So at the time the lawsuit was filed, Dr. Patel was told by St. Luke's that these were fraudulent misrepresentations in the offering documents and so you could sue under the TSA. The lawyer he had at the time, like any lawyer would, look at that admission and say, well, I'll put that in a complaint. But it was later that we discovered it was fabricated, that there really was never anything that anyone could sue under the TSA. Certainly, it states in the same paragraph, there was no basis for St. Luke's to believe before they raised this rescission offer idea. There was no basis for them to believe that any physician had ever thought about, had even tried to sue under the TSA, had even known what the TSA was. There's no basis. Whether it's the release in connection with this TSA thing was broader than TSA violations alone, was it not? Yes, Your Honor. There also, though, was no indication that there would be a suit over anything else. It was the rescission offer process that prompted the lawsuit that was filed. Let me ask you a question. I thought this whole thing got going at least in part because the hospital was losing money. Do your clients deny that? That is – they do deny that this whole thing got going because of that. All right. But there was also associated with the ACA this requirement that basically physicians could no longer run their own hospital, right? May I respond, Your Honor? Yes, please. The ACA amendment meant that there couldn't be any new physician-owned hospitals and that there would be restrictions on existing physician-owned hospitals. Right. And did your clients disagree with the idea that the only way to survive under this new regulatory regime was to expand the hospital? No, Your Honor. My clients and the other doctors weren't even told of St. Luke's plans. I don't care what you were told of or not. Do you disagree with that as a business strategy? Did your clients find that a non-viable business strategy in the wake of the regulation? My clients don't believe it's non-viable, but they also don't believe it's necessary for the success of the hospital. So it would have had to stay the same size. Under the restrictions, yes. Yes. But that didn't mean it couldn't be profitable or ultimately successful. But it wasn't profitable or successful at the time because people were suing them because they weren't making any money off of their investment, right? No, Your Honor. People weren't suing. No one had sued them, but they were grumbling. No, Your Honor. Everybody's perfectly happy. Oh, I put in – I bought three shares. I put in $100,000. And I'm getting nothing. No, Your Honor. No one expected the hospital to be profitable by that point. The hospital had only been open for less than two – for two years plus an October to December time period in 2008. No one expected the hospital to be profitable that quickly. It was a long-term investment. This whole idea that it wasn't profitable in the early years and that's why people sued is completely debunked because no one expected profitability that soon. Well, whatever it was, 92 of the 96 physicians accepted the buyout though, right? That is correct. They accepted the rescission offers. Okay. Thank you.